## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

CAMEO HOLLAND, an Individual and
Next of Kin to Minor Child, S.R.,
Deceased,

                        Plaintiff.

v.

CITY OF OKLAHOMA CITY,

WADE GOURLEY, individually,

COREY ADAMS, individually,

JARED BARTON, individually,

BRAD PEMBERTON, individually,

BETHANY SEARS, individually,

JOHN SKUTA, individually,

                        Defendants.

Case No:     CIV-21-275-J

ATTORNEY LIEN CLAIMED
JURY TRIAL DEMAND

## COMPLAINT

COMES NOW, Plaintiff, Cameo Holland, as the Next-Of-Kin to minor child, S.R., Deceased, by and through counsel, Rand C. Eddy, and brings this action pursuant to 42 U.S.C. § 1983 and Oklahoma law against Defendants City of Oklahoma City, Wade Gourley, Corey Adams, Jared Barton, Brad Pemberton, Bethany Sears, and John Skuta. This case arises from the shooting death of the minor child of Plaintiff, S.R., who was killed by officer of the Oklahoma City Police Department on November 23, 2020. For the seven causes of action, herein, Plaintiff alleges and states the following:

1

## PARTIES

1.      Plaintiff Cameo Holland ("Ms. Holland") is the biological mother and legal guardian to her now-deceased 15-year-old minor child S.R., and as the Next-of-Kin to S.R. is the proper party to this action to obtain relief for claims of wrongful death and civil rights violations. Ms. Holland resides within the boundaries of the Western District of Oklahoma and is a United States citizen as was her son, S.R. At the date of the commencement of this action, Ms. Holland has filed her petition in Oklahoma County District Court for the State of Oklahoma for appointment as Administrator to the Estate of S.R. Plaintiff will seek leave from this Court to amend this complaint to assert her legal relationship to the Estate upon outcome of the aforementioned proceedings.

2.      Defendant City of Oklahoma City ("City") is a statutory municipality pursuant to the laws of the State of Oklahoma, which operates primarily in Oklahoma County, State of Oklahoma, which has the power to sue and be sued and may be served within the boundaries of the Western District of Oklahoma. The Oklahoma City Police Department ("OKCPD") is a government subdivision of the City, which is responsible for the creation and application of policy, practices, procedures, customs, rules, regulations, oversight, supervision, and training to fulfill OKCPD's mandate for the provision of law enforcement and public safety within the boundaries of the City.

3.      Defendant Chief Wade Gourley ("Chief Gourley") is a United States citizen, is an employee of the City, performing within the scope of his employment, under color and authority of state law, within both his individual and official capacities at all times relevant to this action. Chief Gourley is the senior-most administrator of OKCPD, is

2

responsible for the supervision, retention, and training of all OKCPD officers. Chief Gourley is also responsible for drafting, creating, adopting, approving, ratifying, propounding, applying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the OKCPD, including the policies, practices, procedures, and/or customs that violated and/or allowed for the violation of S.R. 's constitutional and statutory rights as set forth in this Complaint.

4.      Defendant Officer Corey Adams is a United States citizen, was and is an employee of the City, performing within the scope of his employment, under color and authority of state law, within both his individual and official capacities, as a police officer for OKCPD, at all times relevant to this action.

5.      Defendant Officer Jared Barton is a United States citizen, was and is an employee of the City, performing within the scope of his employment, under color and authority of state law, within both his individual and official capacities, as a police officer for OKCPD at all times relevant to this action.

6.      Defendant Officer Brad Pemberton is a United States citizen, was and is an employee of the City, performing within the scope of his employment, under color and authority of state law, within both his individual and official capacities, as a police officer for OKCPD at all times relevant to this action.

7.      Defendant Officer Bethany Sears is a United States citizen, was and is an employee of the City, performing within the scope of her employment, under color and authority of state law, within both her individual and official capacities, as a police officer for OKCPD at all times relevant to this action.

8.     Defendant Officer John Skuta is a United States citizen, was and is an employee of the City, performing within the scope of his employment, under color and authority of state law, within both his individual and official capacities, as a police officer for OKCPD, at all times relevant to this action.

## JURISDICTION AND VENUE

9.     For Ms. Holland's Sixth and Seventh Causes of Action under Oklahoma law, the supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367(a).

10.     On December 14, 2020, pursuant to 51 O.S. § 156, Plaintiff gave proper notice to the City Clerk for the City of Oklahoma City of her Oklahoma Law /Negligence Cause(s) of action regarding the death of S.R . More than ninety days have transpired since December 14, 2020.

11.     For Ms. Holland's First through Fifth Causes of Action, the jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on this Court over any civil action arising under the United States Constitution, and specifically, the deprivation of a United States citizen's rights and privileges.

12.     Venue is proper in the Western District of Oklahoma as all actions and omissions alleged herein and giving rise to this action occurred within the boundaries of the Western District of Oklahoma, and all parties reside and/or can be located within the Western District.

## FACTUAL ALLEGATIONS

***ESTABLISHED LAW***

4

13.     The statutory law and caselaw underlying the legal basis for the claims presented herein was clearly established before and at the time of the incidents giving rise to this lawsuit.

14.     United State Supreme Court established clear standards for constitutional use of force in *Graham v. Connor*, 490 U.S. 386 (1989), *Tennessee v. Garner*, 471 U.S. 1 (1985), and numerous subsequent progenies of the aforementioned.

15.     The Tenth Circuit Court of Appeals applied and extended existing and established United States Supreme Court precedent that is applicable to this lawsuit in *Bond v. City of Tahlequah*, Oklahoma, 981 F.3d 808 (10th Cir. 2020).

**THE DEATH OF S.R.**

16.     This lawsuit arises from Defendants' conduct as alleged herein and preceding S.R.'s death which resulted in and caused S.R.'s injuries and death and Plaintiff's injuries.

17.     At approximately 8:00 pm in the evening of Monday, November 23, 2020, fifteen-year-old S.R., an armed robbery suspect, was shot thirteen times by Officers Corey Adams, Jared Barton, Brad Pemberton, Bethany Sears, and John Skuta of the Oklahoma City Police Department ("Defendant Officers").

18.     S.R. died as a result of his wounds sustained from Defendant Officers' gunshots striking his body.

19.     Immediately preceding S.R.'s death, it is alleged by the Oklahoma City Police Department that around 7:45 pm S.R. was in the performance of an armed robbery of the Okie Gas Express in South Oklahoma City.

20.     The store owner, Mr. Khan, who was working at the time of the alleged robbery, exited the store via the drive-through window and then locked the only remaining unlocked door of the two doors to the store building, locking S.R. inside the store alone.

21.     At least eleven minutes expired between the time of the first officer's arrival on the scene and the time S.R. exited the store.

22.     No supervisor or on-scene commander took command and control of the scene to manage and direct the movements, locations, actions, and otherwise activity of, ultimately, approximately the thirty officers who were on the scene at the time S.R. was shot.

23.     OKCPD officers learned details of the situation in a seemingly random, free-for-all manner, predominantly via shouted advisements from various officers on the scene.

24.     Officers arriving on the scene and not in command received no direction from a commanding officer as to the location they should take.

25.     Officers arriving on the scene and not in command did not seek direction from a commanding officer as to the location they should take.

26.     Officers arriving on the scene and not in command took up locations upon their own initiative and, on information and belief, consistent with the inadequate training they received.

27.     While S.R. was locked in the store, numerous officers gave numerous, varying, and conflicting commands to S.R., including "come out with your hands up," "get on the ground," "drop the gun," "come to the door," "put your hands on the door."

28.     While S.R. was locked in the store, officers' actions were not organized, directed, or controlled; officers experienced widespread confusion as to details of the situation; officers acted within and upon their own initiative and direction—not upon an on-scene commander's direction nor upon the provisions of applicable policies of the OKCPD; officers laughed and joked about the situation; and approximately thirty officers arrived on the scene and joined in surrounding the building.

29.     Conducts, acts, and omissions by officers of the OKCPD which preceded the death of S.R. were reckless, negligent, in breach of OKCPD policy, and were a direct and proximate cause of the injuries to and death of S.R.

**AFTER EXITING THE STORE**

30.     Video surveillance from the store and body-worn camera records from Defendant Officers and Officer Carli show S.R. exit the business by climbing out of the drive through window—an act in compliance with commands made.

31.     When S.R. exited through the drive through window—the only unlocked exit—in compliance with commands to exit the building, he was confronted with a chorus of shouts by approximately ten or more officers and a loudspeaker, a disorienting tactical strobe light, a police vehicle within fifteen feet with an officer visibly inside, and more than a dozen officers with pistols, a shotgun, an assault rifle, and a large 40mm bean bag gun drawn and pointed at him.

32.     Audio from body-worn cameras reveal upwards of a dozen OKCPD officers were simultaneously giving him conflicting and varying commands upon his exit of the store, including "show us your hands" and "get on the ground" and "face down".

33.     Responsively, S.R. raised his hands in the air, then lifted his shirt to reveal his bare stomach, waistline, and a pistol in his waistline/pocket.

34.     S.R. then slowly disarmed himself by slowly pulling the firearm from his pants with his left hand, holding it by his thumb and forefinger and dropping the gun on the ground, making a loud and audible metallic sound when it collided with the ground.

35.     S.R. then non-aggressively, at a slow and/or normal speed and not furtively, moved his left hand toward his rear left pocket and his right hand toward his front right pocket or waistline.

36.     As S.R. 's left hand was near his left rear pocket and his right hand at his front right waistline, and before any upward, forward, quick, aggressive, threatening, or furtive movement was made, Officer Sarah Carli fired a 40mm less-than-lethal round striking S.R. in the chest.

37.     Defendant Officers then unlawfully perpetrated a sympathy shoot or contagious, opening fire and killing S.R. immediately upon hearing Officer Carli's shot and without being in or perceiving imminent risk of severe bodily injury or death to themselves or any person.

38.     A sympathy shoot or contagious shoot is when officers fire upon hearing the firing of another officer as opposed to firing upon perception of an imminent risk.

39.     Defendant Officers fired their weapons at S.R. in response to Officer Carli's discharge of a less-than-lethal weapon and not because they perceived any immediate risk from S.R.

40.     S.R. was in the process of complying with commands and surrendering when he was shot at more than twenty times and shot thirteen times by the five Defendant Officers.

41.     At the time he was shot, S.R. was unarmed.

42.     Several shots were fired and struck S.R. after he had been knocked back by other earlier shots, fallen to the ground, lay on the ground moaning, and was no longer a threat.

43.     Dr. Eric Duval, a Medical Examiner, performed an autopsy on S.R. and noted S.R. suffered thirteen gunshot wounds, including to his head, chest, torso, hands, feet, and legs. He concluded the probable cause of death to be multiple gunshot wounds and manner of death to be homicide.

44.     Accordingly, the Defendant Officers have been charged in Oklahoma County District Court for the State of Oklahoma with First-Degree Manslaughter.

45.     The Defendants are liable for the unlawful death and injuries perpetrated against S.R. and Plaintiff on November 23, 2020.

***ADDITIONAL RELEVANT FACTS***

46.     The City by and through its department, the Oklahoma City Police Department, has maintained for a number of years the second highest per capita rate of persons being killed by its police officers, is aware of this fact, but has denied this fact in public statements to media at times relevant and close to events giving rise to this lawsuit.

47.     The City has maintained a pattern, practice, policy, and/or custom of performing excessive force on persons in Oklahoma City.

9

48.     The City has been deliberately indifferent to the OKCPD police officer's pattern, practice, policy, and/or custom of performing excessive force on persons in Oklahoma City.

49.     The City has deliberately perpetuated and affected pattern(s), practice(s), policy(ies), and/or custom(s) of performing excessive force on persons in Oklahoma City and/or resulting in excessive force on persons in Oklahoma City.

50.     At all times relevant, policymakers for the City have been aware of the above but have not taken sufficient action or any action to remedy the circumstances.

51.     Responsive to resident complaints of the City's pattern, practice, and custom of excessive force, the City created a Task Force in the Summer of 2020, which includes the Chief of Police and City Manager, to review and revise the excessive force issues, but its policymakers did not and have not taken any action sufficient to prevent the injuries and death of S.R. and other persons from excessive force by OKCPD.

52.     On December 12, 2020, an OKCPD officer perpetrated excessive force and criminal First-Degree Manslaughter against another resident of Oklahoma City, shooting and killing Bennie Edwards, and the officer has also been charged with the crime in Oklahoma County District Court of the State of Oklahoma.

### *DEFENDANT OFFICER COREY ADAMS*

53.     Officer Adams arrived on the scene about nine and a half minutes prior to him shooting and killing S.R.

54. At the time Officer Adams arrived on the scene there were several patrol cars and officers present already.

55. Upon arrival, Officer Adams exited his patrol car and immediately took up a tactical location behind a gas pump at the store.

56. No officer advised Officer Adams to approach the scene or take the location he took.

57. Officer Adams immediately drew a pistol and aimed it at the entrance to the store nearest him.

58. Upon hearing the increased commotion of the chorus of shouts of officers that occurred when S.R. exited the building, Officer Adams began to run from his location and upon turning the corner and seeing S.R., immediately opened fire and killed S.R.

59. Officer Adams was not, nor was he able to evaluate that any other person was, and nor was any other person in immediate risk of serious injury from and/or by S.R. when or immediately before he shot and killed S.R.

60. Defendant Officers Adams shot and killed a person within the scope of his employment at OKCPD before.

61. Officer Adams shot and killed Tony Mathis in November of 2018.

62. Mr. Mathis was, similar to S.R., unarmed when Officer Adams shot and killed him.

63. The City's continued retention of Officer Adams in a patrol position, which the City knew would likely present Officer Adams with a scenario similar to the instant matter and likely result in Officer Adams shooting another unarmed person, was

deliberately indifferent to the risks of the practice of employing officers with known excessive force risks in position that would permit or encourage that risk to accrue harm and injury to persons, which it did to S.R. on November 23, 2020.

## *DEFENDANT OFFICER JARED BARTON*

64.     Officer Barton arrived on the scene at least eight minutes prior to shooting and killing S.R.

65.     Officer Barton did not have a radio.

66.     Officer Barton deliberately and recklessly walked around the scene, in close proximity to the store, numerous times, and not upon the order of any supervising officer.

67.     Video evidence of the shooting and time preceding indicates Officer Barton walked around in the open area of the parking lot on the drive-through window side, even approaching the window at a close distance of approximately ten feet or less about seven minutes prior to the shooting.

68.     Officer Barton discarded efforts or strategy to use cover as a tactic to safely apprehend S.R. and/or de-escalate the situation.

69.     On information and belief, Officer Barton was not commanded or directed to leave cover and approach the building at any time during his presence on the scene.

70.     On information and belief, Officer Barton's acts on the scene were of his own initiative and not at the direction of a supervisory officer.

71.     About five minutes before shooting S.R., Officer Barton approached Mr. Khan and inquired as to whether Mr. Khan could shut off security cameras and whether they worked and then advises the unidentified Lieutenant 1.

72.     If Officer Barton perceived S.R. posed an imminent risk to severe bodily injury or death to Officer Barton himself, the risk was created by Officer Barton's own reckless and deliberate conduct of emerging from cover and moving in the open toward S.R. and creating a dangerous situation.

73.     Officer Barton was not reasonably under the belief that he or any other person was in immediate risk of serious injury from and/or by S.R. when or immediately before he shot and killed S.R.

74.     Officer Barton was less than or no more than fifteen feet away from S.R., a distance he closed as S.R. stood stationary and Barton approached from cover, when he needlessly and unreasonably shot and killed S.R. with his pistol at close range.

75.     Officer Barton was not in immediate risk of serious injury from and/or by S.R. when or immediately before he shot and killed S.R.

***DEFENDANT OFFICER BRAD PEMBERTON***

76.      Upon arrival at the scene, Defendant Officer Pemberton elected to employ his AR-15-like assault rifle.

77.     Officer Pemberton's assault rifle was affixed with a scope or other targeting enhancement tool and a tactical strobe light.

78.     Officer Pemberton approached the scene and stood behind a vehicle.

79.     Officer Pemberton observed Officer Sarah Carli in the possession of her less-than-lethal weapon as he watched Officer Carli approach him and was immediately adjacent her before and after S.R. exited the store.

80.     As S.R. exited the store, Officer Pemberton took kneeling cover in front of a parked car, about fifteen to twenty feet away from S.R., with his rifle and arms propped on the front right hood of the vehicle and aimed at S.R. with the tactical light activated and strobing.

81.     A tactical strobe light is designed for the purpose of disorienting and blinding person(s) to which it is pointed.

82.     Tactical strobe lights disorient and blind person(s) to which they are pointed.

83.     Officer Pemberton employed his rifle such that he was viewing S.R. through the scope or target enhancing tool affixed to the top of his rifle.

84.     Officer Pemberton was not reasonably under the belief that he or any other person was in immediate risk of serious injury from and/or by S.R. when or immediately before he shot and killed S.R.

85.     Officer Pemberton did, upon Officer Carli's less than lethal shot, needlessly, recklessly, wantonly, unjustifiably, and intentionally discharge his rifle numerous times at S.R., striking and killing him.

86.     S.R. did not pose an immediate risk of serious injury or death to Officer Pemberton or any other person at the time or immediately preceding the time he was shot and killed by Officer Pemberton.

### DEFENDANT OFFICER BETHANY SEARS

87.     Officer Sears arrived on the scene approximately nine minutes prior to shooting S.R. to death.

88.     Officer Sears approached, engaged the scene without receiving or soliciting any direction as to the location she should take.

89.     Officer Sears approaches a gas pump where unidentified Lieutenant 1 ("Lt. 1") is standing, a senior officer, is standing.

90.     Shortly thereafter, the owner of the gas station ("Mr. Khan") attempts to explain the situation to Lt. 1 when the Lt. 1 directs Officer Sears to "talk to him." Officers Sears learns from Mr. Khan that S.R. has one gun, is locked in the gas station alone, and an accomplice fled the scene prior. Immediately after being advised by Mr. Khan, Officer Sears reports on her radio only: "He does have a gun."

91.     Immediately after, an officer on a loudspeaker advises S.R. to drop the gun and come out of the gas station.

92.     Minutes later, Lt. 1, who directed Officer Sears to speak to Mr. Khan, asks Mr. Khan if the drive-through window is unlocked. Mr. Khan answers in the affirmative. Lt. 1 does not relay this information over the radio or to any other officer.

93.     The officer on the loudspeaker gives several commands telling S.R. to approach a door and put his hands on it and wait for further instruction, including "Sir, we have the store surrounded. Come to the door with your hands up and wait for further instruction." Seven seconds later, the same officer tells S.R. over the loudspeaker: "Nobody's hurt. You did nothing wrong right now. We just need you to come out with your hands up, and we need to talk to you."

94.     Officer Sears stands alongside Lt. 1, senior to her, but Lt. 1 does not advise Officer Sears as to a location she should take.

15

95.    About five minutes prior to shooting S.R., Officer Sears and another unidentified officer exchanges jokes and laugh about S.R.'s predicament, stating: "He's probably calling his Mom."

96.    About one minute later and between four and three minutes prior to the shooting, Officer Sears takes control of the strategic approach to the response. She advises Lt. 1 she is "just going to google his number [to the store] and call," and then advises Lt. 1 to "tell country [control] to advise him [S.R.] to answer his phone." Responsively and at Officer Sears' direction, the officer on the loudspeaker advises S.R. to answer the phone. No one answers the phone. One officer observing jokes to Officer Sears that she's probably calling Mr. Khan's cell phone. Officer Sears then asks where the owner is. The attempt to contact S.R. via phone fails, and immediately thereafter, Officer Sears and Lt. 1 are advised the gas pump is not safe cover.

97.    After being advised that a gas pump is not safe cover and about forty seconds prior to S.R.'s exit, Officer Sears and Lt. 1 leave their location to move to an open and uncovered location next to Officer Skuta.

98.    Except advisement to question Mr. Khan, none of Officer Sears' acts were performed at the direction of a senior officer. In fact, Officer Sears directed senior officers and substantially impacted the entire strategic response.

99.    Then Officer Sears needlessly and unreasonably shot and killed S.R., while standing exposed and immediately next to also exposed Lt. 1.

100.    Officer Sears was not reasonably under the belief that she or any other person was in immediate risk of serious injury from and/or by S.R. when or immediately before she shot and killed S.R.

101.    Lt. 1 did not discharge his weapon, because Lt. 1 did not perceive a threat justifying use of deadly force.

102.    Defendant Officer Sears shot and killed a person within the scope of her employment at OKCPD before.

103.    Officer Sears shot and killed Daniel Mihecoby in December of 2017.

104.    OKCPD employees senior to Officer Sears awarded Officer Sears and celebrated her act(s) to kill Mr. Mihecoby.

105.    OKCPD fostered a culture, custom, practice and policy of excessive use of deadly force and excessive use of force, and that was consistent with the manner in which Officer Sears was supervised.

106.    But for the culture, customs, practices, and policies of celebrating use of deadly force and encouraging excessive force, Officer Sears would have been supervised in a manner such that the excessive force she perpetrated against S.R. that resulted in his injuries and death would have been prevented.

***DEFENDANT OFFICER JOHN SKUTA***

107.    Officer Skuta arrived on the scene approximately six minutes prior to shooting S.R. to death.

108.    When Officer Skuta arrived, he immediately retrieved a twelve-gauge shotgun from the rear of his patrol vehicle.

17

109.   Officer Skuta's decision and evaluation to retrieve and employ a shotgun was of his own volition and initiative and not at the direction of an officer-in-command.

110.   As Officer Skuta approached the scene, he removed shotgun shells of a red color from his shotgun and loaded shotgun shells of blue color into the shotgun.

111.   Upon information and belief, Officer Skuta removed buckshot and loaded slug(s).

112.   When fired, a slug shell discharges a single, large projectile, as opposed to the several bb-shape bearings contained in buckshot, which spread when fired to create a larger area of impact than the width of the shell itself.

113.   Shooting a projectile from a long-gun at a range of less than twenty yards allows for drastically increased accuracy and enhanced ability to react to a perceived risk of injury.

114.   Officer Skuta approached, engaged the scene without receiving or soliciting any direction as to the location she should take.

115.   Officer Skuta walked within a close proximity to the drive-through window, approximately less than twenty feet, and took a tactical position behind a parked vehicle.

116.   Upon taking the tactical position, Officer Skuta advised Officer Barton to move because Officer Skuta had a long-gun.

117.   As Officer Skuta took his position, he asked Officer Barton where S.R. was located.

118.    Upon arrival on the scene, Officer Skuta did not receive direction or information from a supervisory officer in his evaluation of firearm selection, placement, tactical location, or suspect information.

119.    All of Officer's Skuta's acts from his arrival onto the scene and up to and including his acts to shoot and kill S.R. were of his own initiative and not at the direction of a supervisor or on-scene commander.

120.    Officer Skuta was not reasonably under the belief that he or any other person was in immediate risk of serious injury from and/or by S.R. when or immediately before he shot and killed S.R.

121.    Officer Skuta needlessly and unreasonably shot S.R. with a long barrel twelve-gauge shotgun from cover.

122.    Officer Skuta shot from cover while standing less than three feet away from Lt. 1 who was standing uncovered and who did not shoot.

## CAUSES OF ACTION

### I.  EXCESSIVE FORCE
**42 U.S.C § 1983 – FOURTH AMENDMENT**
**Presented Against Defendant Officers**

123.    Plaintiff incorporates Paragraphs 1-122 as if fully set forth herein.

124.    Individuals deprived of their Fourth Amendment right to be free from excessive force may seek redress under 42 U.S.C. § 1983. Section 1983 provides a cause of action against any "person" who deprives an individual of federally guaranteed rights "under color" of state law. *See* 42 U.S.C. § 1983.

125.    S.R.  was a fifteen-year-old minor child who weighed approximately 130 pounds.

126.    S.R. did not make any attempt to flee the scene or resist arrest.

127.    S.R. complied with numerous of the conflicting commands made by officers, including dropping his weapon as directed, raising his hands as directed, and exiting the store as directed.

128.    S.R. was unarmed at the time he was shot by Defendant Officers.

129.    S.R. did not make any movements before or after dropping his weapon that were aggressive; or presented an imminent risk to any person or officer; or gave rise to a reasonable perception by any Defendant Officer of an imminent risk of severe bodily injury or death to themselves or another person.

130.    S.R. was in the process of complying with commands and surrendering when he was shot at more than twenty times and shot thirteen times by the five Defendant Officers.

131.    S.R. was struck in the head, chest, torso, both hands, legs, and feet.

132.    Instead of immediately applying medical attention to a child who had been leveled by the gun fire and left moaning on the pavement, officers approached and handcuffed S.R.

133.    S.R. was not warned that he would be shot.

134.    S.R. was not told he was under arrest.

135.    S.R. was told by the officer on the loudspeaker he had done nothing wrong.

20

136.    There is no evidence that suggest S.R. intended to harm any officers or persons after exiting the drive through.

137.    Defendant Officers failed in their duty to act in an objectively reasonable manner while engaging with S.R. who was clearly surrendering.

138.    S.R. was non-combative and did not pose a risk of serious harm to any person at the time he was shot or immediately preceding.

139.    It is clearly established law that a police officer cannot shoot a non-combative and unarmed person who does not present an immediate risk of severe bodily injury or death to the officer or someone else.

140.    Defendant Officer's conduct, acts, and omissions, alleged herein, were a direct proximate cause of the injuries sustained by S.R., and as such they are separately and individually liable for the emotional and physical pain, loss of consortium, loss of companionship, and grief that Plaintiff has suffered. Redress is authorized by 42 U.S.C. § 1983.

141.    Defendants are not entitled to qualified immunity for the complained conduct.

## II. <u>EXCESSIVE FORCE</u>
### 42 U.S.C § 1983 – FOURTH AMENDMENT
### Presented Against Defendant Officers

142.    Plaintiff incorporates Paragraphs 1-141 as if fully set forth herein.

143.    Individuals deprived of their Fourth Amendment right to be free from excessive force may seek redress under 42 U.S.C. § 1983. Section 1983 provides a cause

of action against any "person" who deprives an individual of federally guaranteed rights "under color" state law. *See* 42 U.S.C. § 1983.

144.   When S.R. was first shot with the bean bag and initial lethal projectiles, he was standing.

145.   The impact of the initial lethal projectiles thrust his small body several feet backwards as he fell back, hitting his head on the wall behind him and slumping over to his right side, eventually coming to rest face down.

146.   After S.R. fell and struck the wall, Defendant Officers acted objectively unreasonably to continue to shoot and kill S.R. who had clearly been stuck numerous times and was entirely subdued and not a threat.

147.   S.R. was non-combative and did no more than moan, when he was shot again by Defendant Officers after he had fallen.

148.   It is clearly established law that a police officer cannot shoot a non-combative and unarmed person who does not present an immediate risk of severe bodily injury or death to the officer or someone else.

149.   Defendant Officer's conduct, acts, and omissions, alleged herein, were a direct proximate cause of the injuries sustained by S.R., and as such they are separately and individually liable for the emotional and physical pain, loss of consortium, loss of companionship, and grief that Plaintiff has suffered. Redress is authorized by 42 U.S.C. § 1983.

150.   Defendant Officers are not entitled to qualified immunity for the complained conduct.

### III.   <u>EXCESSIVE FORCE</u>
### 42 U.S.C § 1983 – FOURTH AMENDMENT
### Presented against Chief Gourley

151.   Plaintiff incorporates Paragraphs 1- 150 as if fully set forth herein.

152.   Individuals deprived of their Fourth Amendment rights may seek redress under 42 U.S.C. § 1983. Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed right under color of state law.

153.   At all times relevant, Defendant Chief Wade Gourley was acting under color of state law.

154.   OKCPD Policy for Use of Deadly Force is unconstitutional on its face.

155.   Prior to Defendant Officers shooting and killing S.R. on November 23, 2020, the Chief Gourley developed, maintained, and was responsible for an unconstitutional use of deadly force policy at OKCPD.

156.   The policy provisions of Section 554.40, Use of Deadly Force, of the OKCPD Police Operations Manual provide:

> Officers may use deadly force against a person only if it is reasonably necessary based on the totality of the circumstances, and it is being used:
>
> A. To protect themselves or others when the officers reasonably believe that they or others are in danger of death or serious bodily harm; or
>
> B. To effect the arrest of a person who officers have probable cause to believe has committed a crime involving the infliction or threatened infliction of serious bodily harm, or the person to be arrested is attempting to escape by use of a deadly weapon, or otherwise indicates that the person will endanger human life unless arrested without delay.

157.   The Use of Deadly Force Policy was revised and/or drafted in February of 2020.

158.   Chief Gourley was Chief of OKCPD in February of 2020.

159.   The OKCPD Chief of Police directly participates in the creation or revision of OKCPD policy and has review and ratification authority over all proposed OKCPD policy provisions.

160.   Chief Gourley was directly and personally involved in the Use of Deadly Force policy revision and ratification in February of 2020.

161.   Chief Gourley was directly and personally involved in the creation of the unconstitutional policy.

162.   Chief Gourley personally propounded the revised policy.

163.   It is not constitutional to use deadly force merely to arrest a person who is suspected of committing a crime involving the infliction or threatened infliction of serious bodily injury as Section B of OKCPD's Use of Deadly Force policy provides.

164.   It is clearly established that deadly force is not justified against a person who officers have probable cause to believe has committed a dangerous crime, unless that person also presents an immediate risk of serious bodily injury or death to the officer using deadly force or another person at the time of the use of deadly force.

165.   Chief Gourley intentionally propounded or was deliberately indifferent to constitutional violations in personally propounding the OKCPD's unconstitutional use of deadly force policy.

166.    The policy resulted in a practice and/or custom of excessive force in OKCPD.

167.    Chief Gourley's acts and omissions, alleged herein, were the direct and proximate cause of the acts that injured and killed S.R. and deprived him of his Fourth Amendment rights.

168.    Chief Gourley's conduct, acts, and omissions, alleged herein, were a direct proximate cause of the injuries sustained by S.R., and as such Chief Gourley is liable for the emotional and physical pain, loss of consortium, loss of companionship, and grief that Plaintiff has suffered. Redress is authorized by 42 U.S.C. § 1983.

169.    The constitutional right to be free from excessive force in the form of unreasonable use of deadly force was clearly established in *Tennessee v. Garner*, 471 U.S. 1 (1985). Subsequent caselaw has further and more clearly established this right.

170.    Chief Gourley is not entitled to qualified immunity for the complained conduct.

### IV.  NEGLIGENT TRAINING AND SUPERVISION
### 42 U.S.C § 1983 – FOURTH AMENDMENT
### Presented against the City

171.    Plaintiff incorporates Paragraphs 1-170 as if fully set forth herein.

172.    The City, through its employees, agents, and servants, had a duty and responsibility for the training and supervision of its police officers regarding the appropriate use of force during a seizure and the appropriate methods and practices to avoid the use of deadly force upon a seized person, including those who do not pose an immediate risk of serious bodily injury or death to other.

173.     On or before November 23, 2020, the City's policymakers knew or should have known that their police officers had in the past and in the future would be faced with situations similar to the circumstances and facts alleged herein where the City's police officers are in a position to consider the use of deadly force on a suspect of a dangerous crime, after the commission of the crime, who did not pose any immediate risk of serious injury or death to police officers or others, who had surrendered his weapon, who had complied with commands, and/or who had been severely injured and was lying on the ground in addition to the above.

174.     Section 152.20 of the OKCPD Police Operations Manual provides the following relevant definitions:

    I.   Cooperative Subject – a subject who follows the directions given by a police officer.

    II.   Passive Resistor – an uncooperative subject who is not controlled by the officer's verbal direction but who does not resist an officer in any physical way.

    III.   Active Resistor – an uncooperative subject who uses physical force to resist an officer in a defensive manner, or who attempts to flee apprehension, but shows no signs of attempting to strike or harm the officer.

    IV.   Subject Aggressively Offensive without a Weapon – when a subject show or displays physical aggression towards an officer but appears to have no weapons.

V.   Subject likely to harm others – when a subject becomes aggressive to the point he is likely to harm others with or without a weapon.

VI.   Subject places life and limb in jeopardy – when a subject becomes aggressive to the point he/she places the officer or another person at risk of serious bodily harm or death.

175.   OKCPD officers on the scene, including without limitation supervisory and Defendant Officers, did not follow or apply the above policy provisions, which resulted in S.R.'s injuries and death.

176.   S.R.'s conduct after OKCPD's arrival on the scene, after exiting the store and preceding his death qualifies him as a "Cooperative Subject" and not as any of the other terms above.

177.   OKCPD officers on the scene, including without limitation Defendant Officers, were not adequately trained in above policy provisions such that they would appropriately evaluate the level of threat S.R. posed and thus utilize the proper and justified amount of force to apprehend S.R. safely.

178.   The policy provisions of Section 153.0 of the OKCPD Police Operations Manual provides for the department's de-escalation policy(ies) and includes in part:

>   A. Calling for more resources, such as: 1. Additional officers/supervisors; 2. A CIT officer; 3. Officers equipped with less-lethal devices; 4. A bi-lingual officer; 5. Emergency Medical Services; and/or 6. Other specialty units.
>
>   B. Utilizing available barriers between the non-compliant subject and the officer.
>
>   C. Containing and/or limiting the movement of the subject.

D. Reducing the officer's threat of danger or exposure by moving to a safer position, considering: 1. Distance; 2. Cover; and 3. Concealment.

E. Communicating with the subject from a safe position by: 1. Using verbal persuasion and explanation to promote rational decision making; and/or 2. Giving clear direction and allowing the subject time to comply.

…

Each officer has a responsibility to attempt tactical de-escalation efforts consistent with their training.

179.   OKCPD officers on the scene, including without limitation supervisory and Defendant Officers, did not follow or apply the above policy provisions, which resulted in S.R.'s injuries and death.

180.   OKCPD officers on the scene, including without limitation Defendant Officers, were not adequately trained in the above policy provisions such that they would de-escalate the situation in accordance with OKCPD policy, which would have prevented the injuries to and death of S.R.

181.   Section 554.0 of the OKCPD Police Operations Manual provides, in part, for its use of force policies: "The apprehension of criminal offenders and protection of property must at all times be secondary to the protection of life."

182.   OKCPD officers on the scene, including without limitation supervisory and Defendant Officers, did not follow or apply the above policy provisions, which resulted in S.R.'s injuries and death.

183.   OKCPD officers on the scene, including without limitation Defendant Officers, were not adequately trained in the above policy provision such that they would value S.R.'s life over the urgency to apprehend him.

184.   Section 554.10 of the OKCPD Police Operations Manual states:

> "Deadly force" means force which is intended to cause death or serious bodily harm or which is likely to cause death or serious bodily harm, regardless of intent; discharging a firearm in the direction of a person is an application of deadly force; however, deadly force is not limited to the use of a firearm;
>
> "Excessive force" means any force that exceeds the degree of physical force permitted by law as set forth in this policy
> …
>
> "Reasonably necessary" means all other means to accomplish the desired action have been reasonably exhausted or would be ineffective under the circumstances;
>
> "Serious bodily harm" means bodily injury that creates a substantial risk of death, causes serious, permanent disfigurement, or results in long-term loss or impairment of the functioning of any bodily member or organ . . .

185.   OKCPD officers on the scene, including without limitation supervisory and Defendant Officers, did not follow or apply the above policy provisions, which resulted in S.R.'s injuries and death.

186.   OKCPD officers on the scene, including without limitation Defendant Officers, were not adequately trained in the above policy provisions such that they would understand the facts that:

a.   Their acts to shoot and kill S.R. constituted excessive force;

b.  Their omission to intervene and prevent the shooting or further shooting was demanded by the presence of excessive force;

c.  Their acts to shoot and kill S.R. were not reasonably necessary; and/or

d.  S.R. posed no immediate risk of serious bodily harm to them or any person.

187.  The policy provisions of Sections 568.00, 568.10, and 568.20 of the OKCPD Police Operations Manual regarding barricaded suspects provide:

> Barricaded criminal suspects and barricaded mental health consumers may pose an extreme danger not only to police officers who seek to place them in custody, but to other persons as well. Good judgment demands that a tactical plan be developed rather than immediately rushing a barricaded suspect or mental health consumer. The Tactical Unit Commander shall be consulted in these circumstances.
>
> Upon contact with a barricaded criminal suspect or mental health consumer, the immediate area must be cordoned off to seal avenues of escape. Innocent bystanders must be evacuated from the area. A command post should be established from which operations should be directed. A traffic control perimeter should be established to control traffic in the area. A department tactical radio channel may be activated. Attempts to establish communication with the barricaded criminal suspect or mental health consumer shall be made in an attempt to persuade the subject to surrender. In the case of a barricaded mental health consumer, a CIT officer shall be requested to respond to the scene. The CIT officer will be utilized unless relieved by a Crisis Negotiator with the Tactical Unit. Every possible attempt shall be explored in order to ensure the barricaded subject is isolated. Time is to the benefit of the officers, and the full resources of the department are available to remove the subject from his or her location.
>
> In barricaded subject situations which develop from radio calls or spontaneous activities, the senior uniformed officer present

is in command, and shall immediately request a uniformed supervisor who, upon arrival, shall assume command. The uniformed supervisor shall remain in command of the scene until the arrival of a higher ranking commander, at which time the commander may assume command of the operation. The Tactical Unit Commander will assume command upon his or her arrival. When a barricaded criminal suspect or mental health consumer is located as a result of a follow-up investigation, the senior investigative officer at the scene is in command, and shall immediately request a uniformed supervisor who, upon arrival, shall assume command. After arrival of the uniformed supervisor, the steps outlined in the paragraph above shall be followed.

188.    OKCPD officers on the scene, including without limitation supervisory and Defendant Officers, did not follow or apply the above policy provisions, which resulted in S.R.'s injuries and death.

189.    OKCPD officers on the scene, including without limitation supervisory and Defendant Officers, were not adequately trained in the above policy provisions such that they would apply and follow the above policy provisions for a barricaded suspect, which would have prevented the injuries to and death of S.R.

190.    The policy provisions of Section 258.10 of the OKCPD Police Operations Manual regarding Response to an Armed Robbery provide:

> Unless otherwise notified by the dispatcher, officers responding to an armed robbery call should presume that the suspect is still inside the business and should not immediately enter the scene upon arrival at the business. The initial officer on the scene should assume an inconspicuous position near the business where he can observe activities within the business, if possible. The initial officer should wait for additional back-up units to arrive and direct the other units to strategic locations before taking any further action.

31

> Officers at the scene should attempt to apprehend the suspect
> after he has left the business, circumstances permitting, in
> order to decrease the possibility of a hostage situation.

191.    OKCPD officers on the scene, including without limitation supervisory and Defendant Officers, did not follow or apply the above policy provisions, which resulted in S.R.'s injuries and death.

192.    OKCPD officers on the scene, including without limitation supervisory and Defendant Officers, were not adequately trained in the above policy provisions such that they would apply and follow the above policy provisions for response to an armed robbery, which would have prevented the injuries to and death of S.R.

193.    The policy provisions of Sections 284.15, 284.20, 284.30, 284.40 of the OKCPD Police Operations Manual provides extensive procedures regarding the "Implementation of Active Threat Protocol," "Responsibilities of Responding Officers," and "Responsibilities of the On-Scene Supervisor," "Responsibilities of the Watch/Shift Commander," respectively.

194.    The City, under color of law, failed to provide adequate training to Defendant Officers regarding procedures and methods to avoid the infliction of deadly force and excessive force on a person who did not present any immediate risk of serious injury to any person, was unarmed, was not resisting arrest, had complied with commands, had surrendered his weapon, did not attempt to flee, and did not pose an immediate threat or immediate future threat of serious injury or death. The procedures and methods as to which the City failed to provide adequate training include, but are not limited to, the following:

I.    The proper and reasonable procedures for responding to a barricaded person;

II.   The proper and reasonable procedures for responding to an armed robbery;

III.  The proper and reasonable procedures for responding to an active threat;

IV.   The proper and reasonable procedures for evaluating the compliance and threat level of a suspect and/or person subject to seizure;

V.    The proper and reasonable procedures for responding to an adolescent;

VI.   The proper and reasonable procedures to ensure that a supervisor is in charge and properly coordinates, manages, directs, and oversees OKCPD's response to a barricaded person and/or an armed robbery;

VII.  The proper and reasonable procedures for a supervisory officer to direct, control, manage, and oversee subordinate officers in approaching a scene/suspect and the engagement of officers with a scene/suspect.

VIII. The proper and reasonable procedures for the safe and proper apprehension of a suspect without causing him serious bodily injury or death;

IX.   The proper and reasonable procedures for to be followed when approaching a suspect who is believed to be armed but has surrendered his weapon;

X.      The proper and reasonable procedures for taking control of an arrest scene involving multiple law enforcement officers and ensuring that one officer serves as the primary officer or supervisor;

XI.     The proper and reasonable procedures for taking control of an arrest scene involving multiple law enforcement officers and ensuring that one officer communicates with the suspect;

XII.    The proper and reasonable procedures for communicating with a suspect;

XIII.   The proper and reasonable procedures to be followed with respect to the use of less than lethal force, including, without limitation, advisement of the presence of less than lethal weapons and the use of less than lethal weapons;

XIV.    The proper and reasonable procedures to be followed with respect to the use of deadly force;

XV.     The proper and reasonable procedures for de-escalation prior to the use of deadly force, including without limitation, the application of OKCPD's de-escalation policies;

XVI.    The proper and reasonable procedures to be followed by officers in preparing to fire their weapon;

195.    Proper training in one or more of the procedures listed above would have prevented the shooting and resultant death of S.R. and could, and should, have been implemented by the City.

196.    If the Defendant Officers and/or present supervisory officers were adequately trained by the City in one or more of the above procedures, S.R. would not have been shot and killed on November 23, 2020.

197.    The City failed to properly train its officers, including without limitation all supervisory officers present at and before the shooting of S.R. and Defendant Officers, to follow and apply OKCPD's policies.

198.    Commanding, supervisory, and/or senior officers on the scene failed to take command and/or control of the situation, which caused and/or allowed for:

   a.   Confusion among and between responding officers as to the proper tactics, actions, and/or omissions to affect, take, and/or employ responsive to the situation at hand;

   b.   Breach of OKCPD policy by officer(s), including de-escalation policies, use-of-force policies, use-of-deadly-force policies, barricaded subject policies, incident response and evaluation policies, resistor policies, initial contact policies, on-scene supervision policies, response to an armed robbery policy(ies), and/or active threats policies;

   c.   the conduct by Officers Barton, Adams, Sears, Pemberton, and Skuta on November 23, 2020 resulting in S.R.'s death; and

   d.   the injuries to and death of S.R.  on November 23, 2020.

199.    S.R.'s injuries and death were caused by the City's policy, practice, and/or custom of inadequate training and supervision of its police officers, including Defendant

Officers and on-scene supervisors, and the City's failure to ensure compliance with existing policies and procedures, which would have prevented the injuries to and death of S.R.

200.    The City's custom, pattern, and/or practice of providing inadequate training and supervision of its police officers amounts to deliberate indifference to clearly established constitutional rights of residents of Oklahoma City, including S.R., to be free from use of excessive force and deprivation of Fourth Amendment guaranteed rights.

201.    The reckless or negligent manner in which the City trained and supervised it officers to ensure compliance with and enforce existing policies and procedures created an unreasonably high risk of injury and death to S.R. and other persons.

202.    Policymakers for the City knew to a certainty its police officers would encounter a person inside of a store who was suspected of armed robbery of the store and that its officers would be required to encounter and seize individuals in a scenario similar or identical to events giving rise to this action.

203.    The inadequacy of the City's training and supervisory practices and policies and the City's application and enforcement of department policies, protocols, and procedures, were so obvious and likely or probable to result in the violation of constitutional rights that the City's policymakers acted with deliberate indifference to the need to protect Oklahoma City residents from excessive force violations by OKCPD. The City's policymakers acquiesced in and implicitly authorized the use of excessive force during a seizure.

204.    The City had knowledge of a clear and obvious risk to the constitutional rights of persons with whom its officers would encounter, and the City failed to take

36

sufficient action to prohibit the violations despite the risk. S.R. was injured and died as a result from those injuries.

205.    The City's conduct, acts, and omissions, alleged herein, were a direct proximate cause of the injuries sustained by S.R., and as such the City is liable for the emotional and physical pain, loss of consortium, loss of companionship, and grief that Plaintiff has suffered. Redress is authorized by 42 U.S.C. § 1983.

### V.  DELIBERATE INDIFFERENCE – POLICY, PRACTICE, CUSTOM
### 42 U.S.C § 1983 – FOURTH THROUGH FOURTEENTH AMENDMENT
### Presented against the City

206.    Plaintiff incorporates Paragraphs 1-205 as if fully set forth herein.

207.    Individuals deprived of their Fourth and Fourteenth Amendment rights may seek redress under 42 U.S.C. § 1983. Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed right under color of state law.

208.    Prior to S.R.'s death, the City maintained a custom and/or practice of perpetrating excessive force against persons.

209.    The City celebrates officers who shoot and kill persons.

210.    The City policies and practices undermined and protected officers who commit excessive force from transparency and accountability.

211.    The City allows officers who commit excessive force to review video footages prior to making a statement in any investigation arising from the use of force.

212.   The City allows and encourages officers who perpetrate a use of force and/or excessive force to communicate and conspire with one another immediately upon the commission of the use of force and prior to making statements.

213.   The City allows its employees who are agents, servants, and or officers of the Fraternal Order of Police to access crime scenes and ongoing investigations, which involve excessive or use of force, and obtain information that will be used to protect and shield officers who perpetrate excessive force from accountability.

214.   The City denies the public access or substantially delays public access to records critical to an evaluation of an excessive force instance and use of force instances to shield its officers who come under scrutiny for the perpetration of excessive force and or use of force.

215.   The City maintains, perpetuates, and preserves the second-highest rate of police killings of a police department in the nation and the highest in the State of Oklahoma.

216.   Prior to Defendant Officers shooting and killing S.R. on November 23, 2020, the City and Chief Gourley developed and maintained an unconstitutional use of deadly force policy.

217.   It is not constitutional to use deadly force merely to arrest a person who is suspected of committing a dangerous crime.

218.   It is clearly established that deadly force is not justified against a person who officers have probable cause to believe has committed a dangerous crime, unless that person also presents an immediate risk of serious bodily injury or death to the officer using deadly force or another person at the time of the use of deadly force.

219.    Chief Gourley is, in his official capacity, a policymaker of the City.

220.    Chief Gourley was aware of the use of deadly force policy and was Chief in February of 2020 when the policy was revised and propounded.

221.    The OKCPD Chief of Police has review and ratification authority over the implementation of OKCPD policy.

222.    Chief Gourley, by act and/or omission, was personally involved in the perpetuation of the unconstitutional policy and its contribution to a policy, practice and/or custom of excessive force at OKCPD.

223.    Chief Gourley, by act and/or omission, was personally involved in the perpetuation of a policy, practice and/or custom of excessive force at OKCPD.

224.    The City was deliberately indifferent to the constitutional deficiency of the Use of Deadly Force policy.

225.    The City was deliberately indifferent to the policy, practice, and/or custom of excessive force in OKCPD.

226.    The City's conduct, acts, and omissions, alleged herein, were a direct proximate cause of the injuries sustained by S.R., and as such the City is liable for the emotional and physical pain, loss of consortium, loss of companionship, and grief that Plaintiff has suffered. Redress is authorized by 42 U.S.C. § 1983.

## VI.  WRONGFUL DEATH – NEGLIGENCE
### 12 O.S. § 1053
### Presented against CITY

227.    Plaintiff incorporates Paragraphs 1-226 as if fully set forth herein.

**NEGLIGENT RETENTION**

228.   The City of Oklahoma City, by and through its employees, agents, and servants, had a duty and responsibility to retain officers in a capacity of employment that would prohibit unlawful injury upon a person and/or to not knowingly retain officers in a capacity of employment that would allow for increased risk of unlawful injury upon a person.

229.   Defendants Sears and Pemberton have each shot and killed a person prior to shooting and killing S.R.

230.   Law enforcement officers who shoot and kill a person possess and constitute a substantially increased risk of shooting and killing a subsequent person, committing excessive force, and/or committing unlawful use-of-force, and Chief Gourley is and was aware of this fact at all times relevant.

231.   City negligently retained Defendant Officers Pemberton and Sears in a position of employment that allowed for their presenting an unnecessarily increased risk of severe bodily injury and death by gunfire, which caused the unlawful death of S.R.

232.   But for City's neglect to exercise ordinary care in the retention of Defendant Officers Pemberton and Sears, Pemberton and Sears would not have been in a position to commit the unlawful acts injuring and killing S.R. on November 23, 2020.

233.   Ordinary care on the part of City demanded the non-retention of Defendant Officers Pemberton and Sears as patrol officers and/or officers in a position of employment within OKCPD which carries a substantial, probable, and/or likely risk of requiring a use-of-force within the scope of employment.

**NEGLIGENT SUPERVISION**

234.    The City of Oklahoma City, by and through its employees, agents, and servants, had a duty and responsibility to supervise officers in a manner that would prohibit the unlawful injuries and death S.R. suffered.

235.    The on-scene senior, supervisory, and/or commanding officer(s) were acting within the course and scope of their employment with the City at all times relevant.

236.    For Plaintiff's claims of Negligent Supervision, Plaintiff relies on theories of breach of the supervisory duty of care:

I.    The City, by and through its employees, agents, servants, failed to exercise ordinary care in the supervision of subordinate Defendant Officers in such a manner that would have prevented their unlawful shooting and killing of S.R.

II.    On-scene senior, supervisory, and/or commanding officer(s) failed to exercise ordinary care to supervise, manage, and direct the conduct and performance of the Defendant Officers, as alleged herein, on November 23, 2020. The City failed to supervise officers senior to Defendant Officers in a manner such that the negligent performance of Defendant Officers' duties on November 23, 2020 would have been prevented.

III.    The City failed to supervise the On-scene senior, supervisory, and/or commanding officer(s) in a manner such that the supervisory officers would have maintained control and direction of the scene and of the subordinate Defendant Officers, thereby preventing their unlawful acts, as alleged herein.

237.   But for the City's failure to supervise Defendant Officers by the on-scene senior, supervisory, and/or commanding officer(s), Defendant Officers would have been supervised in a manner preventing their unlawful act(s) which resulted in the injuries and death of S.R.

238.   But for the City's failure to supervise the on-scene senior, supervisory, and/or commanding officer(s), Defendant Officers would not have perpetrated the unlawful act(s) which resulted in the injuries and death of S.R.

239.   The City of Oklahoma City is liable for the negligence of its employees acting within the course and scope of their employment.

**NEGLIGENT TRAINING**

240.   The City, by and through its employees, agents, and servants, failed to adequately train Defendant Officers in a manner that would have prohibited the unlawful injuries and death sustained by S.R. as a result of Defendant Officers' intentional, willful, reckless, and/or wanton conduct alleged herein.

241.   The City, by and through its employees, agents, and servants, failed to adequately train the on-scene senior, commanding, and supervisory officer(s) to supervise, manage, and direct the performance of Defendant Officers in a manner such that would have prohibited the unlawful injuries to and death of S.R.

242.   The City of Oklahoma City is liable for the negligence of its employees acting within the course and scope of their employment.

243.   Accordingly, the City is individually liable for the damages Plaintiff has suffered as a direct and proximate cause of the City's conduct, acts, and omissions alleged

herein, including emotional and physical pain, grief, loss of companionship, and loss of consortium.

## VII.   <u>ASSAULT AND BATTERY</u>
### OKLAHOMA LAW
**Presented, In the Alternative to Oklahoma Law Negligence Claims,**
**Against Each of The Defendant Officers**

244.   Plaintiff incorporates Paragraphs 1-243 as if fully set forth herein.

245.   Defendant Officers, without the consent of S.R., acted with the intent of harming S.R. by shooting more than one lethal bullet at S.R. and did shoot, strike, injure and kill S.R.

246.   Defendant Officers did not possess sufficient cause to justify the battery of S.R.

247.   S.R. was not a threat to Defendant Officers as he had disarmed himself and Defendant Officers observed this prior to shooting S.R.

248.   S.R. was not resisting arrest.

249.   S.R. was unarmed when Defendant Officers shot him.

250.   S.R. did not make an aggressive movement such that would warrant Defendant Officers reasonably possessing fear that S.R. posed an imminent threat of severe bodily harm or death to Defendant Officers themselves or any other person involved.

251.   S.R. was a fifteen-year-old minor child who weighed approximately 130 pounds.

252.   S.R. did not make any attempt to flee the scene or resist his arrest.

253.   S.R. complied with numerous of the conflicting commands made by officers, including dropping his weapon as directed, raising his hands as directed, and exiting the store as directed.

254.   Defendant Officers' fired shot(s) subsequent to their initial shots which struck S.R. after he had already been shot and was falling, had fallen, and/or was laying on the ground and was not a threat to any person.

255.   Accordingly, Defendant Officers are individually liable for Plaintiff's emotional and physical pain, grief, loss of companionship, and loss of consortium suffered as a result of their acts and/or omissions.

## PUNITIVE DAMAGES

256.   Plaintiff incorporates Paragraphs 1-255 as if fully set forth herein.

257.   Plaintiff is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts, and omissions alleged herein constitute reckless or callous indifference to S.R.'s federally guaranteed rights.

258.   Plaintiff is entitled to punitive damages on her negligence/wrongful death claims against the City as its conduct, acts, and omissions alleged herein constitute reckless disregard for S.R.'s rights.

**WHEREFORE**, premises considered and for the reasons set forth herein, Plaintiff respectfully prays this Court enter judgment in Plaintiff's favor declaring Defendants' actions and omissions to be in violation of the law and award Plaintiff the relief requested, including, without limitation, actual damages in excess of seventy-five thousand dollars, with interest accruing from the date of this action's commencement, damages for emotional

and physical pain and suffering, loss of consortium, and punitive damages in excess of seventy-five thousand dollars, and the costs of this litigation and reasonable attorney's fees, together with any further legal and/or equitable relief the Court determines to be appropriate under the laws of the State of Oklahoma and the United States.

Respectfully,


s/ Rand C. Eddy
Rand C. Eddy, OBA # 11822
MULINIX EDDY EWERT & McKENZIE PLLC
Oklahoma Tower
210 Park Avenue, Suite 3030
Oklahoma City, Oklahoma 73102
Office: (405) 232-3800
Email: rand@lawokc.com

*Attorney for the Plaintiff*